UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION


IN RE:  GRAND JURY MATTER        Case No. 14MC60
                                 September 29, 2014



SEALED TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE SOLOMON OLIVER, JR.
UNITED STATES DISTRICT JUDGE


APPEARANCES:

For the Government:        Lauren Bell,
                           Chelsea Rice,
                           Asst. United States Attorneys
                           801 West Superior Avenue
                           400 U.S. Court House
                           Cleveland, Ohio   44113
                           (216) 622-3600

For Jeremy Bullins:        George Argie, Esq.

For Robert Toth:           Dominic Vitantonio, Esq.


Court Reporter:            Susan Trischan, RMR, CRR, FCRR
                           7-189 U.S. Court House
                           801 West Superior Avenue
                           Cleveland, Ohio   44113
                           (216) 357-7087

Proceedings recorded by mechanical stenography.
Transcript produced by computer-aided transcription.

1          MONDAY, SEPTEMBER 29TH AT 10:30 A.M.

2                   THE COURT:  You may be seated.

3                   Good morning.

4                   Will counsel for the United States introduce

5      themselves for the record?

6                   MS. BELL:  Good morning, Your Honor.  Lauren

7      Bell, Assistant United States Attorney along with my

8      colleague Chelsea Rice, also an Assistant United States

9      Attorney.

10                   THE COURT:  All right.  And will counsel

11     for -- let me make sure I've got this right -- for Jeremy

12     Bullins introduce himself for the record?

13                   MR. ARGIE:  Good morning, Your Honor.  George

14     Argie on behalf of Jeremy Bullins.

15                   THE COURT:  All right.  Is Mr. Bullins to your

16     right?

17                   MR. ARGIE:  Yes.

18                   THE COURT:  All right.  And then counsel for

19     Bob Toth.

20                   MR. VITANTONIO:  Good morning, Your Honor.

21     Dominic Vitantonio, I represent Mr. Toth.

22                   THE COURT:  All right.  And Mr. Toth is seated

23     to your right, is that correct?

24                   MR. VITANTONIO:  Yes.  Yes, Your Honor.

25                   THE COURT:  All right.  So this is a

1    proceeding related to the grand jury matter, and it grows

2    out of a motion for inquiry into potential conflict of

3    interest filed by the United States.  And that motion raised

4    issues relative to the representation of Mr. Bullins and

10:45:52  5    Mr. Toth by Mr. Argie and by Mr. Vitantonio.

6              And I saw this morning and had a chance to

7    read, also, the Toth reply to the government's motion for

8    inquiry of potential conflict of interest, and I did not get

9    a chance to read the transcript that was attached, so if

10:46:19 10    that becomes pertinent as we move forward, you can make me

11   aware of what -- what you'd like to point me to in that

12   regard.

13             I just didn't have time this morning, as I was

14   reading, to get -- get that far.

10:46:35 15             All right?

16             MR. VITANTONIO:  Your Honor, did I attach that

17   to the --

18             THE COURT:  There was a transcript attached.

19             MR. VITANTONIO:  Yes, Your Honor.  I did.

10:46:44 20             THE COURT:  From Kentucky.

21             MR. VITANTONIO:  Yes.  From the McCoy case,

22   yes, Your Honor.

23             THE COURT:  Right.

24             MR. VITANTONIO:  Yes.

10:46:49 25             THE COURT:  But I had another matter outside

1    of Court this morning.  When I came in, I received this

2    reply.  I think it was just filed this morning, right?

3                    MR. VITANTONIO:  It was filed this morning,

4    yes, Your Honor.

10:47:04  5             THE COURT:  So that's why I was delayed in

6    coming out.  I wanted to make sure that I had a chance to

7    read what you have written.  So I got through the reply, but

8    I didn't get through the transcript so.

9                    MR. VITANTONIO:  Your Honor, could I just say

10:47:17 10   that I cited all of the pertinent language that I thought

11   was pertinent in the brief?  So I know it's a long

12   transcript, but I did try to pull out whatever I thought was

13   relevant and I put it into the reply.

14                   THE COURT:  All right.  So now, Rule 44(C),

10:47:56 15   I'm not sure whether it directly requires this inquiry but

16   at least this inquiry pertains to 44.  The 44(C) requires

17   the Court to look into joint representation when two or more

18   defendants have been charged jointly under Rule 8(b) or have

19   been joined for trial under Rule 13.

10:48:30 20                  Then it says "And, (b), the defendants are

21   represented by the same counsel or counsel who are

22   associated in law practice."

23                   In this case, the government is saying that

24   the Court should inquire at the grand jury phase, and

10:48:54 25   basically the government is saying that they have some

1    reason to be concerned about a conflict at the grand jury

2    stage, but also it's hard to disentangle representation at

3    this stage from potential conflicts at the pretrial stage

4    and also possibly at trial if the representation starts now,

5    and so it could occur at any of those phases.

6            They also indicate that based on what their

7    investigation reveals, that the alleged roles of the

8    defendants in respect to the investigation that's taking

9    place by the government are different, and so it's that

10    difference in roles also which heightens their concern.

11            I read the response, and I understood

12    you -- just pull that up.

13            I understood you to say, Mr. Toth, that you

14    represent -- not Mr. Toth -- Mr. Vitantonio, that you

15    represent Mr. Toth, that Mr. Argie represents Mr. Bullins,

16    but you have not communicated your relative discussions and

17    positions with each other, and that you only have an

18    attorney/client relationship with Mr. Toth and that you have

19    no attorney/client relationship with Mr. Bullins, and that

20    there is no joint representation between the two persons

21    under investigation, Mr. Bullins and Mr. Toth.

22            Is that -- am I right on that?

23            MR. VITANTONIO:  Your Honor, yes.  That's all

24    accurate.

25            The only thing I would add to that is that in

1    terms of discussions, I mean, the only thing that myself and

2    Attorney Argie discussed are what lawyers would normally

3    discuss.  If we discuss defense strategy, we discuss defense

4    strategy.  We don't discuss attorney/client confidences.

10:51:49  5          Our representation, Your Honor, has been

6    independent since the beginning.  Since the days the fellows

7    walked into the office, they were separated and they were

8    counseled separately.

9          It's been that way since the beginning, Your

10:52:00 10   Honor, so everything I said is accurate.

11          THE COURT:  Wait.  When you said they are

12   counseled separately, you mean that you are counseling

13   Mr. Toth without Mr. Argie being involved at all?

14          MR. VITANTONIO:  Absolutely.

10:52:11 15          THE COURT:  And vice-versa.

16          MR. VITANTONIO:  Absolutely, Your Honor, 100

17   percent.

18          THE COURT:  Well, when you talk about defense

19   strategy, that does sound like you share some information

10:52:23 20   and position, the position with the defendant.

21          You do that, is that correct, share some

22   information and some strategy regarding some positions you

23   should take I think you're saying.

24          MR. VITANTONIO:  Because the cases are

10:52:41 25   factually related, yes, Your Honor, we do.

1          THE COURT:  Now, the Rule says "represented by

2    same counsel or counsel associated in law practice."

3          You are associated in law practice, is that

4    right?

10:52:52  5          MR. VITANTONIO:  Yes, Your Honor.

6          THE COURT:  I mean, would you --

7          MR. VITANTONIO:  Yes.

8          THE COURT:  -- call it -- there are a lot of

9    ways to be associated in law practice, as you know.

10:53:02 10          What would you call your arrangement?

11    Sometimes it's a partnership, you share resources, clients,

12    secretaries.

13          What is the nature of the relationship between

14    the two lawyers?

10:53:19 15          MR. VITANTONIO:  Your Honor, could I ask

16    Mr. Argie to answer that?  The only reason I say that is

17    because I actually joined his law firm after I got out of

18    law school, so I think he's better equipped.

19          He manages everything.  I don't.  So I'd

10:53:34 20    rather have him answer that.

21          Is that okay?

22          THE COURT:  All right.  That's fine.

23          Mr. Argie, could you kind of give me a

24    description of what you view the relationship to be between

10:53:47 25    you and Mr. Vitantonio in the practice of law?

1          MR. ARGIE:  Yes, Your Honor.

2          First of all, Argie, D'Amico & Vitantonio is

3     not a formal partnership.  It's a trade name that was

4     registered with the State of Ohio.

10:54:01  5          We are, in fact, I would call it a loose

6     partnership.  We do share in fees from time to time.  We do

7     share space.  We do share secretaries.  We do share

8     resources.

9          So I think that's the best way I could sum up

10:54:20  10    the relationship.

11         THE COURT:  Now, when you say you share fees

12    from time to time, does that mean that that's on a

13    client-by-client basis, or do you take fees into the firm

14    and you determine later what your draw will be at the end of

10:54:44  15    the year or some point, and also Mr. Vitantonio's?

16         MR. ARGIE:  The way I would describe it, Your

17    Honor, is, for example, if Mr. Vitantonio would bring in a

18    client, that he would retain a certain portion of that fee.

19         THE COURT:  Okay.  So each, each lawyer gets

10:55:10  20    the lion's share of any fee that he or she brings in, while

21    sharing some proportion of that with the other lawyers?

22         MR. ARGIE:  Yes.  For example, a portion may

23    go to overhead and there may be some division of the fee

24    after that.  It's on a case-by-case basis.  Like I said,

10:55:31  25    it's kind of a loose-partnership-type arrangement.

1               THE COURT:  So let me see if I can understand.

2               I understand some of the larger firms and how

3  they operate, and of course if a person does better in

4  bringing in clients, they may get more money, but as I

10:55:50  5  understand some of the, at least, larger scale firms, they

6  have a range of clients for the firm.  Each lawyer gets to

7  bill out at his or her rate or there would be some -- some

8  other kind of fee negotiated, whether it's by the hour or

9  whether it's contingent or what have you.

10:56:09 10           That money comes into the firm, and the firm

11  is -- has that money available to it.

12           Now, at the end of the year, a person doesn't

13  get the money that Procter & Gamble paid in or some other

14  entity paid in.  What they get is their proportionate share,

10:56:35 15  partnership share.

16           So if they -- there's a certain share they

17  would get maybe based on a number of factors, but including

18  their ability to not only produce a number of billable

19  hours, but also the ability to bring in clients and so

10:56:53 20  forth.

21           So that's how their money gets enhanced.  But

22  they don't have -- as I understand it, it wouldn't be that

23  the money that they get is Procter & Gamble money or Eaton

24  Corporation money or some other money like that.

10:57:11 25           So how does your firm operate in that regard

1    as between the people who are loosely part of the

2    partnership?

3                    MR. ARGIE:  Well, Your Honor, there's a set

4    salary, and then at year's end there may be some

10:57:23  5    distribution based on the performance of the firm as a

6    whole, or it could be based upon the business that the

7    individual lawyer may generate.

8                    We are a small firm.  There's only three

9    lawyers.  It's a very close-knit firm.  We work together in

10:57:43 10    what is equitable for everyone and, fortunately, it's worked

11    for a number of years.

12                    THE COURT:  You start out with some amount

13    that each person would get?

14                    MR. ARGIE:  Yes.

10:57:53 15                    THE COURT:  And then depending on how you do

16    overall, you would then divide up profits?

17                    MR. ARGIE:  Yes.

18                    THE COURT:  So when you are dealing

19    with -- how do you normally deal with -- you do criminal

10:58:13 20    defense work?

21                    MR. ARGIE:  We do.

22                    THE COURT:  And how do you normally apply the

23    fees from a case that you defended?

24                    Put aside this case for a moment, we'll come

10:58:24 25    specifically to this case, but how do you normally divide up

1    the fees from your criminal work?

2              MR. ARGIE:  Again, Your Honor, it would depend

3    on the source of the client, where it came from, whether it

4    was business generated by myself or Mr. Vitantonio, or from

10:58:41  5    time to time Mr. D'Amico is also a member of the firm.

6              THE COURT:  Right.  But since you started out

7    with a certain amount of salary which you've allocated to

8    each person, you're looking for -- you're looking to share

9    the money that comes in that's generated by the various

10:59:03 10    lawyers during the course of the year, and so would

11    everybody share ordinarily in the fees that are brought in

12    relative to a particular defendant ordinarily?

13              MR. ARGIE:  Not everyone.  For example, if

14    Mr. Vitantonio brought in a case, that case would be shared

10:59:33 15    with actually myself and Mr. Vitantonio after some

16    reasonable amount for overhead and that sort of thing.

17              Some cases are more profitable than others.

18    Sometimes we don't get paid.

19              So like I said, it's on a case-by-case basis

10:59:49 20    so.

21              THE COURT:  Right.  But when do you make that

22    decision; like when you make the initial arrangement with

23    the defendant, or do you make that decision downstream after

24    the case is over?

11:00:03 25              I mean, how do you -- how do you do that?

1           MR. ARGIE:  Typically downstream, as you put

2     it, Your Honor, at year's end we might sit down and talk

3     about it.

4           THE COURT:  But if a case is a paying case and

11:00:18  5     it's not one of those where you've got to struggle to get

6     some money but there's some real money there, you would

7     allocate that up front, right?

8           MR. ARGIE:  Not necessarily.  Might wait until

9     year's end.

11:00:31 10           THE COURT:  But what would be the expectation,

11     ordinary expectation in regard to a good criminal case?  A

12     good one that pays, I mean.  I don't mean in terms of

13     outcome or result or anything like that.

14           MR. ARGIE:  Expectation of whom?

11:00:45 15           THE COURT:  Of the parties, the partners.

16           MR. ARGIE:  Well, for example, Your Honor, in

17     a case that came in, it was a reasonable case, reasonable

18     fee, we might allocate a third to overhead, a third to

19     Mr. Vitantonio and a third to myself.

11:01:00 20           THE COURT:  And the other person that's in

21     your law practice doesn't share in the same way?

22           MR. ARGIE:  He would share in the same way,

23     but not in a case brought in by Mr. Vitantonio.

24           THE COURT:  Okay.  So if he brought in a case,

11:01:14 25     then he would share it with you maybe a third?

1          MR. ARGIE:  Perhaps.

2          THE COURT:  And Mr. Vitantonio would not share

3    in that?

4          MR. ARGIE:  Right.

5          THE COURT:  So when you come to this

6    particular case with Mr. Bullins and Mr. Toth, would you

7    have made arrangements up front in regard to how fees would

8    be shared here, or have you discussed that matter?

9          MR. ARGIE:  Your Honor, this situation here,

10   both Mr. Toth and Mr. Bullins are members of a policemen's

11   union called the Ohio Patrolmen's Benevolent Association.

12   I've been doing work with them since the early eighties.

13   Mr. Vitantonio has been doing it since he came into the

14   firm.

15          We are compensated, the firm is compensated

16   for the time that we devote to defense and criminal matters

17   such as these.  That goes into the firm.  It goes into the

18   firm account.

19          THE COURT:  All right.  So when it goes to the

20   firm account, would all three of you share it as part of the

21   firm, or would this be a situation where again

22   Mr. Vitantonio would get, after overhead, the lion's share

23   and then you would get perhaps up to a third and vice-versa,

24   where if you bring in someone, does he get a third, a

25   portion?

1           MR. ARGIE:  Your Honor, in this particular

2   situation?

3           THE COURT:  No.  In any situation.

4           First, I forgot to cover the situation where

11:03:02 5   you'd bring in someone, not Mr. Vitantonio, not your other

6   partner but yourself.  When you bring in a client, is there

7   that arrangement of overhead plus you're getting a portion

8   plus then is that shared with any of the other two?

9           MR. ARGIE:  Not necessarily.  Not necessarily,

11:03:26 10   but it could be.  Again at year end in some form of bonus

11   depending on how the firm performs overall, it could be that

12   Mr. Vitantonio and Mr. D'Amico could share in some way.

13           THE COURT:  Do you have a title within the

14   firm?

11:03:40 15           MR. ARGIE:  Owner.

16           THE COURT:  Okay.

17           MR. ARGIE:  So to speak.

18           THE COURT:  You're the owner?

19           MR. ARGIE:  Yes.  I mean, I do all the

11:03:46 20   management, I handle the bank accounts, I do payroll.

21           The firm started out just me.  It's grown to a

22   couple more lawyers over the years, so I've pretty much

23   taken on that responsibility.

24           THE COURT:  But when you say that the name of

11:04:00 25   the firm is a trade name, but are you -- is it a corporation

1      of any kind?

2                      MR. ARGIE:  No, sir.

3                      THE COURT:  Okay.  But it's a firm that's

4      owned by you with the two other lawyers working really for

11:04:19  5      you?

6                      MR. ARGIE:  Yes, Your Honor.

7                      THE COURT:  And how long has Mr. Vitantonio

8      been working for you, approximately?

9                      MR. VITANTONIO:  Since '91.

11:04:34 10                      THE COURT:  '91?

11                      MR. ARGIE:  1991.

12                      THE COURT:  So you have a long relationship.

13                      And what's the other attorney's name?

14                      MR. ARGIE:  Louis D'Amico.

11:04:43 15                      THE COURT:  Okay.  How long has he been there?

16                      MR. ARGIE:  Prior to Mr. Vitantonio.  I want

17      to say maybe two or three years earlier.  Late eighties.

18                      THE COURT:  Late eighties.

19                      Okay.  How long have you been in the practice?

11:04:55 20                      MR. ARGIE:  Well, on my own since 1986.

21                      THE COURT:  All right.  So whatever you would

22      bring in as relates to Mr. Bullins, the other lawyers may or

23      may not share in it, depending on the overall outcome of the

24      firm's work that year, right?

11:05:24 25                      MR. ARGIE:  I'm sorry, you said --

1          THE COURT:  They could or could not, depending

2     on the outcome at the end of the year.

3          MR. ARGIE:  Right.

4          THE COURT:  But in regard to the fees that

11:05:36  5     Mr. Vitantonio would take in regard to Mr. Toth, he would

6     receive, according to the normal way you would do this,

7     after overhead, the lion's share of what was above and

8     beyond that, and then you would maybe take up to a third if

9     this was a paying matter, is that right?

11:06:04 10          MR. ARGIE:  I'm sorry, you're asking in this

11     particular case?

12          THE COURT:  Would it follow the normal pattern

13     that the firm follows in regard to payment of fees?

14          MR. ARGIE:  No, sir.  In this particular case,

11:06:21 15     as I mentioned, I've been doing work for the OPBA since the

16     early eighties, and as a result it's kind of my client so to

17     speak.

18          So what can happen is those -- what will

19     happen is those fees will come into the firm.

11:06:37 20          THE COURT:  Right.

21          MR. ARGIE:  Go into the general account and be

22     factored in at year's end as to -- and may perhaps in the

23     form of a bonus.

24          THE COURT:  Well, you said it will go into the

11:06:50 25     general account.  That means it will be available for

1    general payment of expenses.

2                    MR. ARGIE:  Yes.

3                    THE COURT:  Is there a separate account on the

4    books as being your monies that you would get?

11:07:01  5                    MR. ARGIE:  We keep track of what comes in,

6    yes, Your Honor.

7                    THE COURT:  But at the end, you're making sure

8    that the money that comes out is specific money, money that

9    you have generated specifically?  I mean, that same money is

11:07:13 10   earmarked to come out?

11                    MR. ARGIE:  I'm not following you, "come out."

12                    THE COURT:  Well, I talked about what I

13   thought -- I've never worked at a large law firm -- but what

14   I thought was the model of those firms where, you know, I

11:07:30 15   might get paid, let's say, 300,000 -- just throw it out

16   there -- and the money I was being paid as a partner

17   wouldn't be money that someone could draw off from whatever

18   Eaton Corporation, if I represented them, paid me.

19                    It would all be thrown into a big pot for the

11:07:47 20   firm.  I would be working for the firm.  And so at the end

21   of the year, I might be recognized for having put in a large

22   number of hours in the firm at my rate, or I might also be

23   recognized for the fact that I brought in Eaton as a client,

24   but there would be no one-to-one correlation between the

11:08:08 25   money that Eaton pays into the coffers of the firm and what

1        I got out.

2                      And so I was just trying to get a sense, I

3        think you did say that if Mr. -- that a portion of

4        Mr. Vitantonio's money representing Mr. Toth would certainly

11:08:32  5        be distributed, I thought you said, to --

6                      MR. ARGIE:  No, sir.  No.

7                      I didn't mean to interrupt you.

8                      THE COURT:  Well, I may have misunderstood.  I

9        thought the money he brought there would be distributed

11:08:43 10        according to the model you described, but maybe not.

11                      MR. ARGIE:  Not in the case of the Ohio

12        Patrolmen's Benevolent Association.  That goes into the

13        general fund.  At year's end, the focus isn't necessarily on

14        the OPBA fees that were paid during the year, but just the

11:08:59 15        overall profitability of the firm at year's end, so I

16        wouldn't necessarily focus on just OPBA but, you know, we

17        have obviously other clients and just take a look at the

18        total picture at year's end, and if it's a decent year, a

19        good year, there would be a bonus to follow.

11:09:18 20                      THE COURT:  All right.

21                      MR. ARGIE:  Not necessarily based on OPBA or

22        any one particular client.

23                      THE COURT:  But you put all the monies that

24        come in from the three of you in the way of fees, that goes

11:09:30 25        into one pot.

1          MR. ARGIE:  That's correct.

2          THE COURT:  But you have some ways

3     then -- what is that?

4          THE CLERK:  I don't know.  Someone is working

11:09:41 5     on something.

6          THE COURT:  And then at year's end you have

7     some way -- maybe not a formula -- of determining how much

8     each of you are going to get from that overall pot, right?

9          MR. ARGIE:  Right.

11:09:58 10          THE COURT:  And I understand that you are the

11     owner, you are the person that pulled all this together.

12          And I'm not trying to pry into matters for any

13     reason whatsoever other than trying to get a handle on

14     whether there's this potential conflict and whether there's

11:10:20 15     maybe an actual conflict.  That's really the only reason.

16          MR. ARGIE:  I understand.

17          THE COURT:  So I want you to understand me.

18          MR. ARGIE:  I understand.

19          THE COURT:  I'm not trying to break apart the

11:10:31 20     long-standing relationship you've got or anything that you

21     have agreed to in regard to how you disburse fees in a firm.

22          And I certainly wouldn't be asking or having

23     any interest in that subject, I want you to understand that

24     and I want your clients to understand that, because I want

11:10:52 25     them to understand I've got a few more questions to ask, but

1    I need to understand the nature of the relationship between

2    the lawyers and their law firm.

3                    And so the questions are asked really to try

4    to give me the best understanding I can as to how things

11:11:12  5    work.

6                    MR. ARGIE:  I understand.

7                    THE COURT:  And I'm almost at the end, I may

8    be at the end right now at least of the first phase of my

9    questions, and I appreciate your being very forthcoming and

11:11:24  10    cooperative and providing that, that information.

11                    So let me just ask this question about

12    Mr. Vitantonio then.  Let's use that as an example and

13    Mr. Toth.

14                    So he gets his money from -- you can answer it

11:11:44  15    or your partner -- your money comes in from Mr. Toth, goes

16    into the pot.

17                    At the end of the year, how do you -- how is

18    it -- what credit are you given or how does that figure into

19    what money you're getting out of the pot?

11:12:07  20                    I mean, is that looked at at that point in

21    time?  And if so, how do you look at that?  What is the

22    variable?

23                    MR. ARGIE:  Your Honor, again we have a small

24    firm, kind of loose.  The focus is not on work that

11:12:23  25    Mr. Vitantonio did for the OPBA.  He might have done a lot

1    of work.  We might have had a bad year, you know.

2              So it's all looked at collectively.  It's not

3    what Mr. Vitantonio did on any particular case or

4    Mr. D'Amico or myself.  All the money that goes into the pot

11:12:40   5    is looked at collectively.

6              It's only in those instances where

7    Mr. Vitantonio or Mr. D'Amico on their own generate a

8    client, that formula I mentioned to you earlier kicks in.

9              THE COURT:  All right.  I think I'm

11:12:56  10    understanding.

11              So there are particular instances where they

12    generate a client themselves, but in this case where you're

13    dealing with it -- what is it called -- Patrolmen's --

14    what's the name of it?

11:13:08  15              MR. ARGIE:  The Ohio Patrolmen's Benevolent

16    Association.

17              THE COURT:  -- the Patrolmen's Benevolent

18    Association where you've had some ongoing work over the

19    years, you don't view that as someone getting his or her own

11:13:20  20    client.

21              MR. ARGIE:  Correct.

22              THE COURT:  So even though they are the

23    particular people who may be doing work in the firm, that

24    gets thrown into the pot and people share generally in that,

11:13:31  25    as you do with other revenues in the firm.  It's not

1    particularly recognized as being generated by a particular

2    lawyer.

3                    Is that right?

4                    MR. ARGIE:  That's correct, Your Honor.

11:13:43  5          THE COURT:  All right.  Okay.  That's all.

6    You may be seated.

7                    MR. ARGIE:  Your Honor, could I add one thing?

8    As you know, Mr. Vitantonio filed a responsive pleading

9    today.

11:13:51 10          I've had opportunity to review that, and I

11   didn't go through the trouble of preparing something that

12   would be very similar to that given that I think that the

13   arguments and analysis that Mr. Vitantonio has put before

14   the Court in his brief apply equally to my client.

11:14:07 15          So in that respect, we would join in those

16   arguments and analysis that he has made.

17                   THE COURT:  Thank you.

18                   MR. ARGIE:  Yes, thank you, Your Honor.

19                   THE COURT:  Let me say to your clients who are

11:14:30 20   under investigation that again I understand, you know, that

21   it happens when the government is investigating you, files a

22   motion and says look into our representation and see

23   whether, you know, there should be a waiver or whether a

24   waiver is not appropriate, whether or not it should be a

11:14:58 25   requirement that there be new counsel, that that might cause

1       you to raise a question as to, well, how can the government

2       do that or what is the government's aim and so forth.

3                    But it's not unusual.  They have some

4       responsibility.

11:15:16  5          The thing you should be aware of is that the

6       final decision on that is up to the Court, but the reason

7       why these matters of conflict are raised is, one, sometimes

8       it may not be absolutely clear, for example, to a person

9       under investigation what potential conflict means.

11:15:39 10          Also, candidly, it's an opportunity for your

11      own counsel to think through the matter, to be able to put

12      forth their thoughts, but the basic notion is that every

13      person who comes before the Court should have a lawyer who

14      is exclusively dedicated to you because of what

11:16:07 15     your -- what's happening with you.

16                   At this point you have not been indicted, but,

17      nevertheless, there's a very serious proceeding going on

18      where the government is looking into that possibility.  That

19      is obviously a very important proceeding.

11:16:23 20          Another possible proceeding if you were

21      indicted -- and you have not been -- is when you get to the

22      stage where you're exchanging information with the

23      government, where you're deciding whether to go to trial or

24      whether you will perhaps take an offer by the government to

11:16:44 25     plead to something, it may be something less than all the

1    charges, it may be by an agreement that you will get a

2    recommendation for a lower sentence before the Court, and

3    people often stand in a different position relative to each

4    other when they are being investigated.

5            And so the question becomes if information is

6    being shared, that it might be very difficult for one party

7    to take a position to move forward in his or her own

8    interests when that might damage the representation of the

9    other party if the two -- either the two lawyers are working

10   together or one lawyer's representing two, two people.

11           That's really what we try to look at.  So I

12   don't know the facts of this case or anything like that, but

13   if it's an investigation about alleged police misconduct, I

14   know it's something like that, and believe me, I don't know

15   the facts, but let's say one person witnesses something but

16   the other person commits the act, one could be viewed as

17   condoning the act but, nevertheless, not as culpable as the

18   other person, for example.

19           And so when you're trying to work through all

20   that, it may be that no matter what, you would not testify

21   against the other person or you would not take any kind of

22   deal or plea.  Maybe you would stand fast and never do that

23   on your own, but it may be that you could say, "Look, agree

24   to X.  That's what I did.  I don't think it's unfair for me

25   to be honest about why that may implicate somebody else."

1          So if you work together, it may be in your

2     interests to work together but it may not be in your

3     interests to work together, and so that's why the Court is

4     called upon to ask these questions.

5          There are also rules related to professional

6     responsibility, the State of Ohio, and those also deal with

7     potential conflicts and conflicts, and they're meant to

8     ensure that every person who is represented gets the

9     undivided attention and loyalty of the lawyer representing

10    them, and that you're not -- and that the lawyers are not

11    torn in terms of what they should do because it might

12    conflict with the representation of another -- another

13    person.

14         No matter how close of friends you are with

15    the family members, your squad car members or whatever,

16    you're still entitled to that kind of representation.

17         And so that's -- that's the purpose.

18         Now, I tried to lay out some of that, but some

19    of that the government cited in its brief.

20         At the grand jury stage, the government could

21    offer immunity or -- not immunity, they could -- it could be

22    a lesser charge or it could make some various kinds of

23    agreements at that stage.  That's one place.  But the other

24    may have to do with plea bargaining after an indictment.

25         And then another stage may be you're at trial

1    and whether you're going to put on a defense or not.  The

2    government has to prove its case beyond a reasonable doubt.

3    You don't have to put on anything, but the question becomes

4    you say, "Well, we might rely on the fact that the

5    government hasn't proven its case," and stop there, but you

6    also could say, "No, I'm going to take that stand" or "I'm

7    going to call some people, I'm going to put them on."

8              But the question becomes would you do that if

9    you had to be concerned about somebody else or somebody else

10   was tied into you in terms of representation, that kind of

11   thing, whether you would take the stand yourself.

12             And then if one witness goes on the stand,

13   let's say two of you were involved in something, the

14   question becomes how does your lawyer cross-examine the

15   other person?  It may be that your interests somewhat

16   conflict, they are a bit competing.

17             So one lawyer, you got two lawyers working

18   together, if they're really truly working together and

19   you're working together jointly, how could your lawyer get

20   up and really go all out and cross-examine in a way which

21   might be helpful to your case, even though it might also

22   assist the government to some extent with that kind of

23   cross-examination?

24             And when you're doing the closing argument now

25   at the end of the case and you want to convey to the jury

1    that you didn't do anything wrong and there are two people,

2    do you have to argue strongly that the other person didn't

3    do anything wrong also, or are you free to try to make your

4    case with your lawyer without the lawyers having to worry

5    about whether too strong an argument on your behalf in a

6    certain way might affect the other person negatively.  So

7    that's another place.

8              And as I said before, people's roles -- I know

9    it's all alleged, alleged roles here and I acknowledge that,

10   but people's alleged roles in offenses often are not exactly

11   the same.  So they would not be perceived by the prosecutors

12   or by the jury, for example, to be the same.  And so the

13   question becomes when you've got two people represented by

14   the same lawyer or the same law firm, how can that be sorted

15   out or would that come through?

16             So I think I've given enough kind of examples

17   of where there could be some issues raised in regard to

18   conflict.

19             And so sometimes the Court can determine that

20   a conflict, potential conflict isn't sufficient enough to

21   require the attorneys to step off the case on condition that

22   the parties waive any potential conflict.

23             Sometimes the conflict, both real and

24   apparent, is such that even with a waiver, it's not enough;

25   that there's enough conflict or potential conflict the Court

1       sees that the Court can say "There's no way you can waive

2       that because it's pretty clear that that kind of problem

3       could exist."

4                    Last thing I will say -- I guess I shouldn't

5       say the "last thing," but in this line is it doesn't get

6       easier as you go down the line because you might conclude at

7       one stage that you're sure that you don't have a conflict or

8       that a waiver would do, but at every stage you're going to

9       have to be doing that kind of evaluation.

10                   So if you got through the grand jury stage and

11      you say, "Well, we're pretty sure there's no conflict here"

12      and so forth and you're satisfied then, then when you get to

13      the pretrial stage, the government is sharing all the

14      information it has with you and they're really, you know,

15      coming on strong as you expect them to and they say, "Look,

16      this is what we got on you.  Relative to the other person,

17      it's a lot less, or whatever, or it's a lot more, and so it

18      behooves you to enter a plea," and then the question becomes

19      how do your interests relate to the other parties and

20      whether the lawyers would feel comfortable letting one party

21      enter a plea when the other person is left out, then to have

22      that person testify against them and make the case.

23                   So that's -- I think that's -- I think I've

24      set out the concerns.

25                   So, Mr. Vitantonio, before I inquire, if I am

1      going to inquire anything of these defendants -- not

2      defendants, because they're not defendants, I apologize for

3      that -- of Mr. Bullins and Mr. Toth, tell me again what the

4      nature of the sharing arrangement is relative to the

11:27:11   5      defendants.  That's important to know in terms of the

6      information and strategy.

7              You don't have to tell me any details and, of

8      course, I wouldn't want you to do that, and the government's

9      here, but generically I guess I need to know that.

11:27:30  10             MR. VITANTONIO:  Your Honor, are you asking

11      for the type of information?

12              THE COURT:  Right.

13             MR. VITANTONIO:  Your Honor, I wouldn't

14      characterize it any differently than, for example,

11:27:41  15      information I would share with any other counsel who I had a

16      co-defendant with.

17              I mean, I can give you an example.  I mean,

18      myself and Kevin Spellacy are right now co-counsel for

19      Mr. Toth, and I've been on cases with Kevin Spellacy before

11:28:01  20      a couple of times where we've represented separate people

21      and, you know, naturally we have co-defendants.  We talk

22      about stuff and issues and motions we might file and what

23      the government did or didn't do or what they're going to do

24      and how we strategize.

11:28:19  25              I wouldn't characterize my discussions any

1    differently.

2              The only thing is I don't share confidences of

3    a client as to what he tells me, which is material to his

4    case and his defense.

11:28:30  5              So I mean, you know, Mr. Argie knows this guy

6    got a target letter, but --

7              THE COURT:  Let me -- but ordinarily, because

8    you and Mr. Argie work together and you would not, where you

9    didn't have two defendants that were subject of the same

11:28:55 10   grand jury process, or if they were not co-defendants in a

11   case, you would normally look to him as someone to discuss

12   the entire matter with, right, in regarding whether or not

13   you should enter a plea or whether your thoughts are right

14   or correct about a case or whatever, that's part of your

11:29:15 15   team, isn't it, ordinarily?

16             MR. VITANTONIO:  Just like any other lawyer.

17             THE COURT:  When you say "any other lawyer,"

18   this is a lawyer who shares in the fees that you receive in

19   a case.  I mean, you're considered to be one firm in some

11:29:31 20   ways.  You'd be cautious in talking to someone in your own

21   law firm about a defendant ordinarily, even if there was no

22   possible argument that there was a conflict?

23             MR. VITANTONIO:  No.  If it was -- if he

24   didn't represent a co-defendant, it would be different.  I

11:29:53 25   could talk to him and, Your Honor, I'll --

1          THE COURT:  That would be the norm, wouldn't

2     it?  I mean, if I owned a law firm, I want to have bright,

3     smart partners in the law firm, you could bet I would be

4     down the hall talking to them if we were considered one

11:30:10  5     firm.

6          If we were not considered one firm, then I

7     would have some other obligations which I would have to be

8     aware of, but that's the way I would think about it.

9          MR. VITANTONIO:  Sure.

11:30:19 10          THE COURT:  And just as I think the

11     prosecutors would do the same.

12          But here you're saying that you sought to

13     represent Mr. Toth with the fact in mind that there's a

14     potential conflict?  I mean, is that how you thought about

11:30:41 15     it, or what?

16          MR. VITANTONIO:  Your Honor, that's how I

17     thought about it from the very beginning.

18          When I told Mr. Toth, when I found out that

19     they were both -- that there were two people that worked for

11:30:53 20     Westlake Police Department, I said, "You come and you meet

21     with me, I'm going to represent you, and whoever represents

22     Mr. Bullins will represent Mr. Bullins.  I'm not talking to

23     you both at the same time and I'm not talking to him.  I'm

24     representing you."

11:31:08 25          It's been that way since the beginning, Your

1    Honor.  I've never talked to Mr. Bullins about his

2    involvement in the case, and that's case closed.

3                    THE COURT:  How about Mr. Spellacy?  He's also

4    representing Mr. Toth?

11:31:27  5                    MR. VITANTONIO:  Yes, Your Honor.

6                    My understanding is Mr. Spellacy is a personal

7    friend of Mr. Toth.  After I was representing Mr. Toth for a

8    while, he was apparently talking to Mr. Spellacy and he put

9    him on some sort of retainer, and we're co-counselling at

11:31:46 10    the moment.  We represent the same client.

11                    THE COURT:  And Mr. Bullins doesn't have any

12    extra lawyer?

13                    MR. VITANTONIO:  Not to my knowledge.

14                    THE COURT:  He's just represented by

11:31:53 15    Mr. Argie, is that right?

16                    MR. ARGIE:  That's correct, Your Honor.

17                    THE COURT:  So you and Mr. Spellacy are

18    sharing in the whole process of representation?

19                    MR. VITANTONIO:  Yes, Your Honor.  So far we

11:32:05 20    have been.

21                    We've met with the U.S. Attorneys one time

22    together to discuss a possible proffer or cooperation, and

23    that was our only meeting so far.

24                    THE COURT:  So the two of you?

11:32:19 25                    MR. VITANTONIO:  The two of us did, yes.

1          THE COURT:  And has he been part of any of the

2     joint strategy meetings between you and Mr. Argie?

3          MR. VITANTONIO:  I know that we were

4     altogether at one or two points in time and talked, but if I

11:32:43  5     had to say, I'd say yes, because I know we were all together

6     and I know the subject came up.

7          THE COURT:  And would you share, would you

8     share with Mr. Argie the conversation that you had with the

9     government when you went down for a potential proffer?

11:33:07 10          MR. VITANTONIO:  I would tell him the results.

11          THE COURT:  When you say "the results."

12          MR. VITANTONIO:  Or the conclusion.

13          THE COURT:  What they offered you or talked to

14     you about and what you decided to do?

11:33:18 15          MR. VITANTONIO:  I would tell him what I

16     decided to do, yes, Your Honor.

17          THE COURT:  Well, yeah, maybe when you tell

18     them what you decided to do, that would mean you would also

19     share with him what they were offering you.

11:33:33 20          MR. VITANTONIO:  Your Honor, as far as an

21     offer, that never came up and then, no, that was not part of

22     it.

23          THE COURT:  Or what they claimed they had on

24     your guy or on somebody, I mean the information that they

11:33:45 25     imparted to you?

1            MR. VITANTONIO:  No, Your Honor.  Never, never

2    did that.

3            THE COURT:  All right.  Mr. Argie.

4            MR. ARGIE:  Yes, Your Honor.

11:33:59  5            THE COURT:  What about the information which

6    you shared?  What is the arrangement you see between

7    yourself and Mr. Vitantonio and how you've been operating to

8    date?

9            MR. ARGIE:  Your Honor, I wouldn't discuss

11:34:14 10   anything with Mr. Vitantonio that would in any way violate

11   the attorney/client privilege.

12            I would talk to him like I might talk to

13   another defense counsel that, you know, was perhaps

14   representing a key defendant in the case, and that would be

11:34:29 15   to discuss strategy.

16            I may even ask him -- he may not tell

17   me -- what's the government offering your client, whatever

18   the case might be.  But I wouldn't treat Mr. Vitantonio any

19   differently than another attorney that was involved in the

11:34:47 20   same case with a co-defendant.

21            THE COURT:  How often have you been kind of

22   thrust in this kind of situation where either you're

23   representing defendants in the same investigation or

24   defendants who have been jointly indicted?

11:35:10 25            Is this something different?  Don't you have

1    to think about this differently than you would normally

2    think about your other criminal cases?

3                      To what extent have you given thought to that?

4                      MR. ARGIE:  Your Honor, there have been over

11:35:21  5    the years quite a few cases, and even through the OPBA,

6    where police officers have been targets of investigation,

7    were ultimately indicted, and we have jointly

8    represented -- not jointly, excuse me -- separately

9    represented those defendants in those situations.

11:35:47 10                  We've had other cases where you might have a

11    husband and wife.  Sometimes, depending on the circumstances

12    of the case, you might refer the wife to another lawyer, for

13    example, or if we could determine that after we assess it

14    that there's not a conflict, we would discuss it with the

11:36:01 15    clients and, you know, go with representing them

16    individually within our firm representing one defendant and

17    the other.

18                      So it's not -- I don't think it's been that

19    uncommon over the years.  First time I've had a hearing like

11:36:14 20    this, though.

21                      THE COURT:  Have you had any conversation with

22    Mr. Bullins about potential conflicts and as to your

23    thoughts and his thoughts about that?

24                      MR. ARGIE:  I have, Your Honor.

11:36:31 25                      THE COURT:  You have?

1          MR. ARGIE:  Yes.

2          THE COURT:  All right.  And when was that,

3     approximately?

4          MR. ARGIE:  Well, Your Honor, I don't recall

11:36:40  5     specifically.

6               There may have been some discussions very

7     early on in the case, but obviously in light of the motion

8     filed by the government we discussed those matters in

9     greater detail, gone over their motion, the issues they've

11:36:55 10     raised and so more recently, in the last maybe couple weeks,

11     we've had more detailed discussions about that issue.

12          THE COURT:  All right.

13          MR. ARGIE:  We made it very clear in the

14     beginning of this matter when we got involved that they

11:37:09 15     would each have separate counsel, independent counsel

16     representing their interests in this investigation.

17          THE COURT:  You assured them of that when they

18     first hired you that even though you're in the same law

19     firm, that they would have independent counsel representing

11:37:32 20     them?

21          MR. ARGIE:  Yes, Your Honor.

22          THE COURT:  All right.  Mr. Vitantonio, have

23     you had discussions with Mr. Toth about potential conflict?

24          MR. VITANTONIO:  I did, Your Honor.

11:37:45 25          THE COURT:  Okay.  And when did you have that?

1              MR. VITANTONIO:  Well, my answer is similar,

2      but as I told the Court starting off, I do this as a matter

3      of course.  I told him I was meeting with him, I'm

4      representing him, I'm representing nobody else, so I guess

11:38:03  5      you can call that the beginning of it.

6              But then we didn't discuss that much because

7      there was no need to.  What we talked about was always in

8      private and there was no third parties involved and I

9      advised him separately all the time.

11:38:17 10              When the government filed the motion, I

11      explained to him, you know, why it was filed, what the Court

12      would look at, what the legal reasons are, what conflicts

13      are all about, I gave him examples and then I, you know, did

14      some research, did a brief, sent it to him, made sure he

11:38:35 15      understood it.

16              We talked about it.  In the last two weeks we

17      talked about it quite a bit, you know, knowing that this

18      hearing was coming up.

19              THE COURT:  All right.  I'm going to -- I'm

11:38:47 20      going to ask -- you may be seated.

21              I'm going to ask each of the persons who are

22      under investigation from the grand jury Mr. Bullins and

23      Mr. Toth a few questions.

24              Let me say before I do that, one of the

11:39:08 25      reasons I feel compelled to go further, sometimes there are

1    different relationships between lawyers that occupy the same

2    suite of offices and I've encountered that before, and

3    sometimes they share only offices even though they may be in

4    a situation where they look like they're in the same firm.

5    Sometimes they share secretaries and expenses

6    but no resources at all, even though they're in, three, four

7    people in a firm.

8    And then your situation seems to be a little

9    different than that.  It seems to me based on what you

10   described that you really are a law firm, but you have

11   different ways of sharing fees, but it seems to me more

12   analogous to what we think of as a law firm, where you bring

13   in monies, but then you have ways of dividing the money up,

14   based on seniority, based on the ability to get clients,

15   those kind of things.

16   But that the money isn't separated out, so

17   that the money that comes in for Mr. Vitantonio is all run

18   through his account, even if he has to eventually pay

19   something at the end.

20   It's pretty clear that fees are shared, though

21   lawyers may get some special credit for bringing in clients,

22   and -- their own clients; that most of the resources are

23   shared.

24   And it also seems pretty clear that at least

25   in regard to the Patrolmen's Benevolence Association

1    situation where they are paying for representation, that

2    that money is not viewed as someone bringing in and

3    generating a client at this point, but it's money that goes

4    into the general pot and isn't broken down by who brought it

5    in.

6            So to me it does seem to fit the model of two

7    persons being represented by the same law firm.  That's what

8    I gather.  And so that's -- that's the kind of scrutiny that

9    has to be given to it.  That suggests the kind of scrutiny

10   that has to be given to it.

11           So let me ask, Mr. Bullins, would you raise

12   your right hand?

13                    (JEREMY  BULLINS SWORN)

14           THE COURT:  You may be seated, and just speak

15   directly into the microphone when I ask you some questions.

16           Mr. Argie is your counsel, is that correct?

17           MR. BULLINS:  Yes, Your Honor.

18           THE COURT:  And again I don't want you to feel

19   intimidated in any way.  I understand you're in a Court

20   before a Judge and I understand some of the anxiety that can

21   come from that, but I'm not here, I'm not trying to scare

22   you, I'm not trying to attack your attorneys, I'm not.  I

23   want you to understand that.

24           I'm not trying to make any -- raise any

25   questions about their competence or anything like that.

1          Have no reason to in terms of -- you

2     understand that?

3          MR. BULLINS:  Yes, Your Honor.

4          THE COURT:  I'm here for one reason only and

11:43:06 5     that is to exercise my responsibility as a Judge in a

6     situation which I know is difficult for you.

7          When I say "a situation," I just mean being

8     considered for a possible indictment.  That's serious enough

9     as it is before even being indicted, and then the kinds of

11:43:25 10     things that could follow.

11          I'm not in a position to conclude what will

12     happen.  I can't say you will be indicted.  I can't say any

13     of that.  I'm not part of that.

14          Even though Ms. Rice and Ms. Bell work for the

11:43:40 15     government, the government is many things.  Just because

16     they get paid by the prosecutor doesn't mean that the two of

17     us are working together.  That's not it.

18          I am neutral.  I'm independent.  I'm a Judge.

19     They have a certain responsibility as a prosecutor, and your

11:44:00 20     counsel have certain responsibility representing you, but I

21     am in the middle.  I am an independent person in my

22     authority, and I have these responsibilities so that's why

23     I'm asking you these questions, to make sure that you have

24     the kind of representation that our system requires and that

11:44:24 25     would serve your best interests.

1          You understand that?

2               MR. BULLINS:  Yes, Your Honor.

3               THE COURT:  And I'm not trying to push you one

4     way or the other to say any particular thing.

11:44:37  5          Now, do you think that you generally

6     understand what I've been talking about in terms of

7     potential conflict?

8               MR. BULLINS:  Yes, I do.

9               THE COURT:  And do you understand that when

11:44:48 10   two people are allegedly involved in something, that

11    sometimes people don't have exactly the same role in that

12    matter, if you assume that there is such a matter?

13               Do you understand that?

14               MR. BULLINS:  Yes.

11:45:05 15               THE COURT:  And that happens all the time, I

16    mean in situations, especially where police officers are

17    involved, because one could be doing X, the other could be

18    watching X or they both could be doing exactly the same

19    things, but it doesn't always happen that way.

11:45:25 20               And so you understand that even though two

21    people may be looked at as arguably involved in something,

22    they may not be looked at the same way?

23               MR. BULLINS:  Yes, Your Honor.

24               THE COURT:  And you understand that the

11:45:38 25   government's going to sometimes share information with you,

1    maybe they won't share everything, but sometimes open up the

2    possibility of talking with you if that's what you want to

3    do.

4                     You understand that?

11:45:55 5           MR. BULLINS:  Yes, Your Honor.

6                     THE COURT:  And you understand that if a party

7    is represented by the same lawyer or lawyers, that there's a

8    possibility -- I'm not saying it will always happen -- that

9    if you're working together as a team, two defendants, that

11:46:11 10   what one does might hurt the other?

11                    Do you understand that?

12                    MR. BULLINS:  Yes, Your Honor.

13                    THE COURT:  And what's best for one is not

14   necessarily the best for the other.

11:46:22 15                    Do you understand that?

16                    MR. BULLINS:  Yes, Your Honor.

17                    THE COURT:  And so the reason I've been

18   raising these questions is because, as I said before, at

19   every stage you have to see what's best for you, and this

11:46:42 20   gets tense so you get going toward trial and you may be

21   adamant that you didn't want to go to trial, but you will go

22   to trial and you'll go no matter what, and maybe that will

23   be your position.

24                    But somewhere during that process you might

11:46:59 25   change your mind depending on what's at stake, what's

1    offered you, that kind of thing.

2                    And the question would be that has

3    implications because that means that you might have to

4    testify against -- if there were a co-defendant -- a

11:47:17   5    co-defendant.

6                    Now, you might not view yourself as that kind

7    of person, but you may decide it's in your best interests,

8    it makes sense to do that.

9                    If you have two people and you enter a plea,

11:47:29  10    that's going to have an effect on the other person and their

11    chances.

12                    Do you understand that?

13                    MR. BULLINS:  Yes, Your Honor.

14                    THE COURT:  The same thing would work the

11:47:36  15    other way.  If the other person says, "Oh, no, I've talked

16    to momma, I've talked to daddy, I've talked to everybody and

17    they say, 'Look, go ahead and take that, that seems fair,

18    like the best you're going to get,' I'll just enter a plea

19    and whatever," and assuming they do it knowingly and

11:48:00  20    voluntarily, so they decide to do that, that means they're

21    going to testify against you so your chances arguably are

22    not as good because this is somebody that was out there with

23    you.

24                    You understand how that could happen?

11:48:13  25                    MR. BULLINS:  Yes, Your Honor.

1          THE COURT:  And another thing that could

2     happen, one person enters a plea.  You want to go to trial.

3     It may be you think it's your best interests to go to trial

4     or both of yours, but you can't speak for the other person.

11:48:34  5   Now you're being forced into a plea perhaps because the

6     other person is going to enter a plea and there was some

7     kind of a -- there's joint representation in terms of that,

8     that first plea.

9               You understand that?

11:48:52 10         MR. BULLINS:  Yes, Your Honor.

11             THE COURT:  So all of these things are

12    possible.

13              Then let's take a trial situation.  I don't

14    know anything about the facts, but let's say one party looks

11:49:09 15   a little bit less involved than the other, there's a

16    question of whether you go on the stand or not.  But also

17    there's just a general question, do you take the stand if

18    you feel like you can do yourself some good but you could do

19    the other party some harm, the other person harm?

11:49:28 20              Do you understand that?

21             MR. BULLINS:  I understand that, Your Honor.

22             THE COURT:  And the pressure to sit when you'd

23    like to go because you feel like what you did was

24    explainable but the cross-examination in regard to what the

11:49:41 25   other person did, perhaps, would be -- expose that person.

1              Do you understand that?

2                   MR. BULLINS:  Yes, Your Honor.

3                   THE COURT:  Now, have you -- your counsel said

4       they talked to you about that, and I'm not questioning you

11:50:00 5      about that, but do you recall having a conversation?

6                   MR. BULLINS:  Yes, Your Honor.

7                   THE COURT:  Have you gone over these possible

8       scenarios and how your decision might impact the other party

9       and how the other party might impact you in a joint

11:50:18 10     representation situation?

11                  MR. BULLINS:  Yes, we have, Your Honor.

12                  THE COURT:  Well, there's certainly a

13      potential conflict.

14                  Did you understand that these lawyers were

11:50:35 15     part of the same law firm?

16                  MR. BULLINS:  Yes, Your Honor.

17                  THE COURT:  Have you had any discussions -- I

18      have to ask you this -- about the facts of your case with

19      Mr. Toth?

11:50:55 20                 Have you ever -- I'm sorry -- Mr. Vitantonio?

21      Have you ever discussed the facts of your case with

22      Mr. Vitantonio?

23                  MR. BULLINS:  No, I have not.

24                  THE COURT:  Have you ever been present at any

11:51:05 25     meeting where -- with him where your facts were discussed by

1      your counsel Mr. Argie?

2                     MR. BULLINS:  No, Your Honor.

3                     THE COURT:  Have you been involved in any

4      meeting where Mr. Argie, Mr. Vitantonio, yourself and

11:51:34  5      Mr. Toth were all part of one meeting about the case?

6                     MR. BULLINS:  When we first met with the

7      representatives, we turned over the police reports.  They

8      read them.  And then we separated.

9                     That was the only time we met as a group.

11:51:53 10                     THE COURT:  Now, have you ever met with

11      Mr. Spellacy?

12                     MR. BULLINS:  No, Your Honor.

13                     THE COURT:  All right.  Let me go to Mr. Toth.

14                        (ROBERT TOTH WAS SWORN)

11:52:33 15                     THE COURT:  You are represented by two

16      lawyers, is that right?

17                     MR. TOTH:  Yes, sir.

18                     THE COURT:  Mr. Spellacy and Mr. Vitantonio,

19      is that right?

11:52:43 20                     MR. TOTH:  Yes, Your Honor.

21                     THE COURT:  And have you met with them

22      jointly?

23                     MR. TOTH:  I don't think I have, no.  I don't

24      recall.

11:52:57 25                     THE COURT:  You met with them separately?

1          MR. TOTH:  Yes, sir.

2          THE COURT:  Do you recall ever talking to

3    Mr. Vitantonio, as he said, about potential conflict?

4          MR. TOTH:  Yes, Your Honor.

5          THE COURT:  That you understand that he and

6    Mr. Argie were in the same law firm?

7          MR. TOTH:  Yes, Your Honor.

8          THE COURT:  And when, when is the last time

9    you talked to him about conflict, potential conflict?

10          MR. TOTH:  As recently as last Friday.

11          THE COURT:  Okay.  Did you talk to him before

12    that?

13          MR. TOTH:  Yes, sir.

14          THE COURT:  And what, what are some of the

15    things you talked about in terms of potential conflict?

16          MR. TOTH:  In general, some of the things we

17    talked about are what's good for one client may not be good

18    for the other in a joint case, but that doesn't apply here.

19          THE COURT:  And did he talk to you about some

20    of the things I've been talking about this morning?

21          MR. TOTH:  Yes, sir.

22          THE COURT:  And you heard me go over with

23    Mr. Bullins various ways in which, if you're dealing with

24    joint representation, there can be a conflict or potential

25    conflict, is that right?

1            MR. TOTH:  Yes, Your Honor.

2            THE COURT:  You were paying attention at that

3    time?

4            MR. TOTH:  Yes, Your Honor.

11:54:28  5            THE COURT:  Okay.  And so I will just

6    reiterate to you that those are some of the different ways

7    in which your interests could diverge from that of another

8    person under investigation or who's a defendant.

9            Do you understand that?

11:54:44 10            MR. TOTH:  I understand, Your Honor.

11            THE COURT:  And you could be hurt by a joint

12    representation if your interests were not exactly the same

13    as another person under investigation or defendant, you know

14    that?

11:55:03 15            MR. TOTH:  I understand that, Your Honor.

16            THE COURT:  All right.  Let me ask, Ms. Rice,

17    Ms. Bell, Ms. Bell and -- do you have any comments at this

18    juncture?

19            MS. BELL:  Your Honor, there's one thing I

11:55:26 20    would like to clear up.

21            You asked Mr. Vitantonio if he had shared any

22    information that the government had provided to him with his

23    partner Mr. Argie.  Mr. Vitantonio said no.

24            But I want the record to be clear that we have

11:55:39 25    not shared any information with either attorney, partly to

1    protect the integrity of the investigation and also partly

2    because we saw there was a potential conflict of interest.

3               And so the true question becomes what will

4    happen in the future when information is forthcoming

11:55:57  5    tomorrow.

6               THE COURT:  All right.  Mr. Vitantonio, do you

7    have any response to that?

8               She basically said not that she hadn't talked

9    with you at all, but she hadn't shared any information with

11:56:12 10    you.  She just wanted to clarify from the government's

11    standpoint that that was her position.

12               Do you disagree with that?

13               MR. VITANTONIO:  No, Your Honor.  No.  She did

14    not share any substantive information with me.

11:56:24 15               THE COURT:  All right.  And so you indicate

16    that, just to summarize, Mr. Vitantonio, that you and

17    Mr. Spellacy represent Mr. Toth; that's right?

18               MR. VITANTONIO:  Yes, Your Honor.

19               THE COURT:  And that you have not -- that you

11:56:52 20    and Mr. Spellacy have met with Mr. Toth, but that Mr. Argie

21    has not met with him?

22               MR. VITANTONIO:  That's correct, Your Honor.

23               THE COURT:  That you have not shared anything

24    more than you say what defense counsel would share with

11:57:13 25    other persons who are possibly under investigation or

1    under -- or who are defendants, is that what you --

2                     MR. VITANTONIO:  That's true and accurate,

3    yes.

4                     THE COURT:  And that you have not entered into

11:57:27  5    any agreement or arrangement with Mr. Argie relative to

6    jointly representing these defendants?

7                     MR. VITANTONIO:  That's true, yes.

8                     THE COURT:  And that it is your intent going

9    forward not to discuss your client's case in any way with

11:57:50 10    Mr. Argie other than the way in which a defense counsel who

11    was not part of the same firm could discuss such a case?

12                     MR. VITANTONIO:  That's true, Your Honor.

13    Yes.

14                     THE COURT:  And that you are committed to

11:58:16 15    representing him and making his options available to him

16    regardless of the impact on Mr. Bullins?

17                     MR. VITANTONIO:  Yes, Your Honor.  Only him.

18                     THE COURT:  And so if it meant that his

19    agreement to cooperate, for example, which he's not -- he's

11:58:33 20    not done, he's not said he's going to do, but

21    hypothetically, if he -- you saw his best interests were to

22    cooperate with the government, that you would advise him to

23    do so regardless of the implications to Mr. Bullins?

24                     MR. VITANTONIO:  Yes, Your Honor.  If I

11:58:49 25    thought it was in his best interests, I would advise him

1    accordingly.

2              Mr. Bullins has never talked to me about his

3    case.  I've never shared any confidences with him.  I

4    represent Mr. Toth 100 percent.

11:59:12  5              THE COURT:  Now, you are in the same firm.

6    You do share the same secretary, I assume, or at least the

7    same information technology system, so it would seem to me

8    that there would be certain potential things, even if one

9    were to assume that one could represent without having a

11:59:31 10    conflict or serious potential conflict, I mean are there

11    kinds of walls you've set up or precautions you've taken so

12    that information may not inadvertently be shared from one

13    case to the other?

14              MR. VITANTONIO:  Yes, Your Honor.  We are not

11:59:50 15    on any type of a network.  I have my own personal computer.

16              I actually do almost all of my typing with the

17    exception of once I get a draft of a brief or a legal memo

18    done, I give it to my secretary, that we share, to format,

19    finalize, put it in proper form, make sure it looks nice.

12:00:20 20              But in terms of confidential memos, I do all

21    myself.  I don't share them with anybody, including her.

22    She does not -- I should say we are not networked on a

23    computer.  I have my own personal computer.

24              THE COURT:  All right.

12:00:43 25              Mr. Argie.

1                    MR. ARGIE:  Yes, Your Honor.

2                    THE COURT:  You've indicated that you've had

3      no conversation with Mr. Toth, right?

4                    MR. ARGIE:  That's true, Your Honor.

12:00:55 5                    THE COURT:  And you've had conversations

6      relative to the matters involved here only with Mr. Bullins,

7      your client?

8                    MR. ARGIE:  Yeah.  Other than what he

9      previously described of a very brief meeting where some

12:01:08 10     documentation was turned over to us, and then we met

11     separately.

12                    THE COURT:  And you're representing that you

13     would treat your representation of Mr. Bullins relative to

14     Mr. Toth as being representation only of Mr. Bullins and not

12:01:26 15     Mr. Toth, is that right?

16                    MR. ARGIE:  True, Your Honor.

17                    THE COURT:  And you would treat Mr. Bullins

18     and Mr. Toth just like any other person who was charged who

19     you didn't represent?

12:01:50 20                    MR. ARGIE:  I would, Your Honor.

21                    THE COURT:  And you're saying that if you

22     received an offer from the government -- and this is all

23     hypothetical -- that seemed to be in Mr. Bullins' favor

24     relative to all things considered, that you would have no

12:02:08 25     problem advising him to take that offer even if it was

1    detrimental to the case of Mr. Toth?

2                    MR. ARGIE:  That's correct, Your Honor.  I

3    would counsel him accordingly.

4                    THE COURT:  You may be seated.

12:02:26  5           These are always difficult matters because the

6    Court has to try to balance a party's right to counsel with

7    the concerns about a potential conflict.

8                    There certainly is some potential for conflict

9    here, and that's why I decided to call a hearing on

12:02:55 10   government's motion.  As I indicated before, there's

11   certainly that possibility when two people work for the same

12   firm.

13                   And I don't know that there's any common

14   practice, but I know in some firms they probably would not

12:03:12 15   take two defendants who were involved in the same incident

16   because it could mean that the firm could be on two

17   different sides of a controversy or matter.

18                   So that's the concern.

19                   Clearly, there may not be a conflict of that

12:03:36 20   kind, but if there were a true conflict, it would kind of be

21   like being on both sides of the case.

22                   So the question -- opposite sides of the same

23   case.

24                   So the question is really is there any

12:03:51 25   effective way to ensure that each defendant both

1    understands, fully understands the nature of potential

2    conflicts, fully understands their right to have counsel of

3    their own choosing, and to proceed in the case which would

4    allow them to have that counsel, absent conflict.

5              Now, I don't know.  Again, it's not the

6    government's call.  The government raised these things as

7    regard to a potential conflict pretty quickly here to move

8    forward, at least make some decision at this stage.  Before

9    I do, though, I would give the government a chance to say

10   something if they wish.

11             The reason I do that is because the government

12   has an interest, we all have an interest, the government,

13   the Court and the lawyers, of ensuring the integrity of the

14   criminal justice process and in making sure that the

15   indictment process is proper, making sure that at the

16   pretrial stage and at the trial stage that there are no

17   conflicts because they could also mean that the entire

18   proceeding could be thrown out later on if at least in terms

19   of a trial of the case and that kind of thing, if there have

20   been pleas and so forth.

21             And so there's a strong interest by all that

22   whatever's done, be done fairly and properly.  And

23   that's -- that's the reason why I'll allow the government to

24   speak, although they obviously don't get that

25   decision-making authority.

1        Ms. Bell, is there anything further?

2        MS. BELL:  Your Honor, it's simply our

3    position that there is a potential conflict.  There are

4    several potential conflicts in this case that should not be

12:06:09 5    waived or the Court should not accept a waiver, especially

6    when the policemen's union has picked Mr. Argie, and

7    Mr. Argie said that the union is his client, and that this

8    union has picked this form for both of its members Mr. Toth

9    and Mr. Bullins to represent them.

12:06:26 10        It gives too strong an appearance of

11    impropriety; not even an impropriety, just a conflict that

12    this one firm can make decisions independent of each

13    partner.  And it's not that Mr. Vitantonio would represent

14    Mr. Toth, but it's that Mr. Vitantonio can't be independent

12:06:45 15    of Mr. Argie in their representation of these two

16    individuals.

17        For that reason, the Court should remove these

18    two lawyers and have the union find a different -- two

19    separate attorneys to represent each of their members.

12:07:02 20        THE COURT:  All right.  Are you familiar with

21    any recent examples where issues such as this have been

22    raised or whether there are any other Judges on the Court

23    that recently ran into issues like this?

24        MS. BELL:  Your Honor, we did inquire in our

12:07:23 25    office specifically about the grand jury stage, and this,

1    from our inquiry, is a unique situation in which we're

2    asking at the grand jury stage to inquire into the potential

3    conflict of interest.

4           I have not inquired about this Court in terms

12:07:38 5   of the trial stage.

6           THE COURT:  All right.

7           MR. ARGIE:  Your Honor, may I say something?

8           THE COURT:  You may.

9           MR. ARGIE:  Your Honor, Ms. Bell has stated --

12:07:59 10  I never said that the Ohio Patrolmen Benevolent Association

11   was my client.  That was never stated on the record.

12          My client is Jeremy Bullins.  Mr. Vitantonio's

13   client is Mr. Toth.  They came to us through the police

14   union who does, in fact, pay the bill, but the OPBA is not

12:08:20 15  the client.

16          It's no different than an insurance company

17   that provides representation where they assign counsel to

18   someone in an automobile accident.  In those particular

19   situations, the client is the party who is insured.  The

12:08:34 20  client is not the insurance company, and the client is not

21   the OPBA.

22          THE COURT:  All right.  Thank you.

23          You wish to say anything?

24          MR. VITANTONIO:  I wanted to add one thing,

12:08:45 25  Your Honor.

1              Your Honor, I could say for the record that I

2   have never talked to anybody at the OPBA, the Ohio

3   Patrolmen's Benevolent Association, about any aspect of

4   Mr. Toth's case, about my representation of him, about the

12:09:02  5   status of the case, about anything.  I never breathed a word

6   to anybody.  I've never had a phone call discussion with

7   anybody.  I've never discussed anything.

8              And, Your Honor, the issue about Ms. Bell said

9   that I can't be independent of Mr. Argie, Your Honor,

12:09:18 10   respectfully, I don't know what that means.

11              I don't know how -- I mean, I've been a

12   lawyer, Your Honor, for 25 years.  I'm representing

13   Mr. Toth.  I've successfully represented many defendants

14   without the help of anybody, and I just -- it's kind of

12:09:35 15   offensive to think that -- and I have to say this, Your

16   Honor -- it's kind of offensive to think that she's

17   suggesting that I can't make an independent decision,

18   independent of Mr. Argie on behalf of Mr. Toth, who I've

19   always communicated with about this case exclusively.

12:09:53 20              I fully understand the issues.  I fully

21   understand, you know, the nature of their investigation and

22   I'm more than -- I am more than qualified to represent him,

23   Your Honor, independent of everybody.

24              Thank you.

12:10:08 25              THE COURT:  No, don't be offended.

1    I think basically all that she is trying to

2    do -- and I know you disagree with some of the things she

3    said, and the appropriate thing I think to put on the record

4    is your disagreement.  It is a bit different when you're

12:10:25  5    exactly the same firm, you understand.

6    So that's why we -- that's why it raises the

7    issue that if you've got one firm but you've got two people

8    whose interests may not be totally in sync, then, you know,

9    is that appropriate.

12:10:43 10    And then you say, yeah, I guess your answer,

11    the one you put forward is you kind of -- "First of all, we

12    separate out the representation and we've kind of built a

13    wall so that there is no leakage."  I think that's what

14    you're trying to say in regard to information.

12:11:00 15    Also, you're trying to assure the Court, but

16    again it's kind of on an on-its-face basis, show the Court

17    that you will be sufficiently cognizant of the nature of

18    your duties relative to separate representation, that you

19    can keep them separate.

12:11:23 20    That's not what you would normally have to

21    worry about in your law firm if you didn't have this

22    problem.

23    So it is -- it does present some special cause

24    to think, to reflect, to determine whether something like

12:11:39 25    this could be done appropriately.

1    So I don't, you know -- I think it's -- let

2    me -- just one other thing I want to do.

3    I may very well sleep on this, but let me

4    have -- but I wouldn't take very long -- let me have

12:11:58 5    Mr. Toth, go back to you.  You're still under oath, do you

6    understand?

7    MR. TOTH:  Yes, sir.

8    THE COURT:  Okay.  I'm not saying that I will

9    let you waive any potential conflicts if I find there are,

12:12:12 10    but I do need to inquire whether if having heard of these

11    potential conflicts, things in the way your interests might

12    be different than Mr. Bullins' and how the decision of one,

13    if you were doing it jointly, might negatively impact the

14    other, the question I would have is have you -- are you

12:12:42 15    prepared to say whether or not you would waive any potential

16    conflicts, if conflicts exist, or if conflicts were to

17    exist, you're willing to waive those knowing about them,

18    knowing that they are possible?

19    MR. TOTH:  Yeah, I understand the question,

12:13:00 20    Your Honor, and I would waive those potential conflicts.

21    THE COURT:  And any conflicts that might

22    occur, knowing now that those are possible?

23    MR. TOTH:  I understand that, Your Honor, and

24    I don't -- I don't foresee a problem.

12:13:14 25    THE COURT:  But, okay, you don't -- I know

 1    that you indicate you don't see a problem because the way

 2    it's been described to you in your discussion with counsel,

 3    that you don't think there will be a conflict.  And I

 4    understand that.

12:13:35  5              But I'm asking you whether, given the possible

 6    conflicts I've set out, potential -- that's all we're

 7    talking about right now -- but they could become actual, do

 8    you waive any possible conflicts?

 9              MR. TOTH:  Yes, Your Honor, I do.

12:13:53 10              THE COURT:  You do that knowing what we

11    discussed about potential conflicts, right?

12              MR. TOTH:  Yes, sir.

13              THE COURT:  And you discussed those with your

14    counsel, is that right?

12:14:03 15              MR. TOTH:  Yes, sir.

16              THE COURT:  Mr. Bullins?

17              MR. BULLINS:  Yes, Your Honor.

18              THE COURT:  You're still under oath.

19              You've heard this discussion we've had here

12:14:14 20    this morning, right?

21              MR. BULLINS:  Yes, Your Honor.

22              THE COURT:  And you've been a part of it.

23              So you understand now generally how, if two

24    people are jointly represented, that what's in the best

12:14:29 25    interests of one might not be in the best interests of the

1    other in terms of what decisions are made?

2              Do you understand that?

3              MR. BULLINS:  Yes, Your Honor.

4              THE COURT:  And I understand everything you

12:14:38  5    said before, but I guess I need to know from you whether

6    having heard all the things that we discussed, that you're

7    in a position to say whether you would waive any potential

8    conflicts that might arise?

9              MR. BULLINS:  Yes, Your Honor, I'm comfortable

12:14:56 10    waiving any potential conflicts.

11              THE COURT:  And you do that knowing, knowing

12    what we've discussed about possible conflicts?

13              MR. BULLINS:  Yes, Your Honor.

14              THE COURT:  And that your interests may not

12:15:06 15    be, at any given stage, the same as those of your -- of the

16    other person who's under investigation?

17              MR. BULLINS:  Yes, Your Honor.

18              THE COURT:  All right.  So I guess my -- this

19    is how I think I will proceed.  I said before that one

12:15:41 20    possible thing is to have a waiver, but sometimes the law

21    says a waiver isn't enough.

22              I think that defendants have indicated they

23    knowingly and voluntarily waive any possible conflicts, but

24    my job now is to determine independently whether waiver is

12:16:06 25    enough.

1          So I think that makes a complete record on

2     this.  So I think I'll take two or three days and I'll put

3     something in writing.  It won't be very long -- no more than

4     about three pages or so because the record is there -- but

12:16:23  5     I'd like to take that amount of time to do it.

6          All right.  That will be all.

7          (Proceedings concluded)

8          - - - - -

9     C E R T I F I C A T E

10          I certify that the foregoing is a correct

11     transcript from the record of proceedings in the

12     above-entitled matter.

13

14

15

16     **/s/Susan Trischan**

17     /S/ Susan Trischan, Official Court Reporter

18     Certified Realtime Reporter

19

20     7-189 U.S. Court House

21     801 West Superior Avenue

22     Cleveland, Ohio 44113

23     (216) 357-7087

24

25